# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address*)<br><br>601 Prospect Drive, Montrose, CO 81403, more fully<br>described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)     Case No. 24-sw-1439-RTG |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the District of <u>Colorado</u>, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1348 | Commodities Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

- ☒ Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Kimberly Coombs*
*Applicant's signature*

SA Kimberly Coombs, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by <u>telephone</u>.

Date: <u>October 15, 2024</u>

*Richard T. Gurley*
*Judge's signature*

City and state:   <u>Grand Junction, CO</u>

Richard T. Gurley
<u>United States Magistrate Judge</u>
*Printed name and title*

## ATTACHMENT A
### Property To Be Searched

The property to be searched is 601 Prospect Drive, Montrose, CO 81403, pictured below. A single-story, single-family home that is brown/tan in color with a three-car, attached garage. The premises is further defined to include any garages or sheds and any safes or locked storage containers, as well as any vehicles parked at the premises, and all computers (to include cellular devices and tablets) and electronic storage media.



## ATTACHMENT B
### Particular Things To Be Seized

All evidence, fruits and instrumentalities relating to violations of 18 U.S.C. § 1348 (Commodities Fraud) and 18 U.S.C. § 1343 (wire fraud) involving Jeffrey Royer, including:

1. All items, materials, documents, communications, and/or records, relating to any trading account, including but not limited to any forex, FX, FOREX.com, or foreign exchange account, Mobie account, Coinbase account, or cryptocurrency account;

2. All items, materials, documents, communications, and/or records, relating to any forex, FX or foreign exchange trade(s) or trading;

3. All items, materials, documents, communications, and/or records, relating to any cryptocurrency trade(s) or trading;

4. All items, materials, documents, communications, and/or records, relating to Mobie;

5. All items, materials, documents, communications, and/or records concerning Royer's employment or work history, including any work or employment history (or lack thereof) as a trader, investment advisor, or financial advisor;

6. All items, materials, documents, communications, and/or records, relating to any investor or potential investor, including but not limited to Brent Tomasko, Sandra Holden, Heather Swantek, Erik Hicks, Cynthia Argue, Brenda Moss, and Mark Haeg;

7. All items, materials, documents, communications, and/or records, relating to soliciting, promoting, advertising or discussing any investment(s) or investment opportunity(ies);

8. All items, materials, documents, communications, and/or records, relating to any investor account statement(s);

9. All items, materials, documents, communications, and/or records, relating to any investment account;

10. All items, materials, documents, communications, and/or records, relating to any bank or credit union account, including but not limited to any ATM receipts, account statements, or debit or credit card account information or statements;

11. All items, materials, documents, communications, and/or records, relating to invoices related to any construction or handyman services provided by Royer;

12. All items, materials, documents, communications, and/or records, relating to any meeting with an investor or potential investor including but not limited to all items, materials, documents, communications, and/or records relating to any travel to or from any meeting with an investor or potential investor;

13. All items, materials, documents, communications, and/or records, relating to any deposit(s), transfer(s), or withdrawals from or to the forex trading account, to or from a Coinbase account, or to or from any investment or trading account(s);

14. All items, materials, documents, communications, and/or records, relating to the receipt(s) or payment(s), wire or money transfer(s), or proceeds from or to any investor or potential investor;

15. All items, materials, documents, communications, and/or records, relating to any withdrawal or from the forex trading account, including but not limited to the ability or inability to withdraw any money from the forex account;

16. All items, materials, documents, communications, and/or records, relating to the payment, transfer, or repayment of any investor or investment funds;

17. All items, materials, documents, communications, and/or records, relating to regarding the use, disbursement, or receipt of any investor funds;

18. All items, materials, documents, communications, and/or records, relating to any trading history or trading activity;

19. All items, materials, documents, communications, and/or records, relating to any state or federal tax returns, including any information related to any investment loss, profits, and/or income;

20. All items, materials, documents, communications, and/or records, relating to any application under the U.S. Small Business Administration Economic Injury Disaster Loan program;

21. All items, materials, documents, communications, and/or records, relating to the ownership, occupancy, or use of the premises to be searched;

22. All items, materials, documents, communications, and/or records, relating to evidencing receipt, location, or disposition of assets and proceeds derived from commodities fraud or wire fraud;

23. Any cash; or items, materials, documents, communications, and/or records, in whatever form, identifying the location of safety deposit boxes, storage units, or other possible depositories for cash; and other liquid assets which are identified in any way with Jeffrey Royer, and/or business entities owned by Jeffrey Royer, and any keys or other access devices associated with such depositories;

24. Any safes or other locked containers which could contain any of the above. If any safes or other locked containers are found on the premises, locksmiths are be used to open the safe or container either on the premises, or if reasonably necessary, any safe container may be moved off-premises to be opened;

25. Any items, materials, documents, communications, and/or records, in whatever form, which contain the identity of any other associates or co-conspirators;

26. Any computers or electronic media that were or may have been used as a means to commit the offenses described in this warrant;

    a. For any computer hard drive or other electronic media (hereinafter, "Electronic Device") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

i.   Evidence of user attribution showing who used or owned the Electronic Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

ii.   Passwords, encryption keys, and other access devices that may be necessary to access the Electronic Device;

iii.   Documentation and manuals that may be necessary to access the Electronic Device or to conduct a forensic examination of the Electronic Device.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Kimberly Coombs, being duly sworn, depose and state as follows:

## Introduction

1.     There is probable cause to believe Jeffrey A. Royer, a resident of Colorado, committed commodities fraud under 18 U.S.C. § 1348, and wire fraud under 18 U.S.C. § 1343 (collectively, the "Subject Offenses"), in an investment fraud scheme involving his personal, retail foreign-currency exchange ("forex") trading account. There is further probable cause to believe that evidence, instrumentalities, and fruits of the Subject Offenses are located at Royer's residence, which is in the District of Colorado.

2.     Accordingly, I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to search Royer's residence, located at 601 Prospect Drive, Montrose, Colorado 81403 (the "Target Premises"), further described in Attachment A, for the items listed in Attachment B, which are items that constitute evidence, instrumentalities, and/or fruits of the Subject Offenses. I am requesting authority to search the entire premises, including any sheds or garages and any safes or locked storage containers, any vehicles, computers to include cellular devices, tablets, and computer storage media (collectively, "Target Devices") located therein where any

1

of the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of the Subject Offenses.

### Affiant's Background

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2022. I successfully completed the Basic Field Training Course at the FBI Academy in Quantico, Virginia, where I received extensive training in conducting criminal investigations. I am currently assigned to the FBI Detroit (Michigan) Field Office and my responsibilities include investigating violations of federal criminal law. I have more than two years of federal criminal investigative experience. I have conducted and/or participated in numerous criminal fraud investigations, including, but not limited to, mail fraud, wire fraud, bank fraud, money laundering, investment fraud, and identity theft. I have also conducted and/or participated in other non-fraud related criminal investigations as well.

4.      The facts in this affidavit come from: my personal involvement in this investigation, including, but not limited to, my review of bank records, trading records, electronic payment records, email correspondence, criminal history reports, and victim and/or witness interviews; my training and experience; and information obtained from other law enforcement officials and/or other local, state, or federal government officials. This affidavit is submitted for the limited purpose

2

of showing that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## Probable Cause

5.      On October 3, 2024, a federal grand jury in the Eastern District of Michigan, based on a finding of probable cause, returned a two-count indictment against Jeffrey Royer, charging him with one count of commodities fraud under 18 U.S.C. § 1348, and one count of wire fraud under 18 U.S.C. § 1343. (Case No. 2:24-cr-20565, E.D. Mich.).

### Overview of the Scheme

6.      Beginning in early 2020 and continuing through in or about June 2023, Royer carried out an investment fraud scheme that defrauded investors in the Eastern District of Michigan and elsewhere, involving his personal forex trading account.

7.      At all times relevant to the scheme, Royer lived in Colorado. In the course of the scheme, Royer held at least three in-person meetings with investors and potential investors in Michigan during which he solicited investment funds. In addition to in-person meetings, Royer used various other methods to communicate with investors and potential investors in furtherance of the scheme, including, but not limited to, email and cellphone text messages.

8.      In the course of the scheme, Royer held himself out as an accomplished forex trader and convinced investors to invest money with him in his forex trading account. Royer told investors that he would pool investor funds with his own money in the forex account and use the funds for forex trading to generate investment returns. Royer told investors that his goal was to generate investment returns of ten percent per month for investors and that he would only keep returns above ten percent for himself. Royer encouraged investors to tell others about investing with him in his forex trading account.

9.      As part of the scheme, Royer generated and sent to investors fictitious monthly account statements that purported to show positive investments returns, month after month.

10.      In truth and in fact, Royer was not an accomplished forex trader, his trading was generally unsuccessful, and the trading results Royer provided to investors were false and did not reflect the trading losses actually incurred by Royer. Further, Royer did not invest all investor funds as he had represented, and in addition, he used investor funds to cover personal expenses, which he did not disclose.

11.      Royer also materially omitted telling investors that he was not registered as a commodities pool operator or in any capacity with the United States

Commodity Futures Trading Commission ("CFTC"), and that he had previously been convicted of federal securities fraud, among other charges.

### Opening the forex account and soliciting investors

12.     In approximately September 2019, Royer opened a personal FOREX.com trading account, and began trading in the account in or around December 2019, with a starting cash balance of approximately $5,000. Royer lost over $1,600 in his first month of trading. He fared better in his second month of trading, earning almost $3,400.

13.     After only about two months of trading in the account—only one of which was profitable—Royer began soliciting investors to invest funds in his forex account.

14.     Generally, Royer solicited investors through direct, person-to-person solicitations and referrals from other investors. Early in the scheme, Royer targeted Brent Tomasko as a potential investor in the forex account. Prior to soliciting funds for the forex account, Royer had promoted a cryptocurrency token, called Mobie token or Mobie coin, as an investment opportunity to various individuals, including Tomasko. When Royer solicited Tomasko to invest in the forex account, Royer knew that Tomasko had invested funds in Mobie cryptocurrency tokens and thus was potentially open to investing in matters that Royer promoted.

15.     Tomasko, believing that his investments with Royer were growing in value, told others, including his friends and relatives, about investing with Royer. A number of Tomasko's friends and relatives, including but not limited to Heather Swantek, Erik Hicks, and Sandra Holden, ultimately invested in Royer's forex account. In fact, a number of those who invested in Royer's forex account reported doing so after they heard about positive investment returns that Royer was purportedly generating for investors.

### In-person investment meetings in the Eastern District of Michigan

16.     As part of the scheme, Royer held in-person meetings in the Eastern District of Michigan with investors and potential investors during which he solicited investment in his forex account, promoted its purported profitability, and encouraged investors to tell others about it.

17.     In or around February 2020, Royer sent an email to investors and potential investors stating that he was looking to set up a meeting with people who had "an itch" to get their lives "bumped to another level financially." In the email, Royer claimed to have a background "in the trading world" and that he traded his "own FX account every day." He stated that "professional traders really make these investments rock," and that he wanted to come to Michigan to get "a few people in a room and show the details of what this entails." Following that email, Royer traveled to Michigan in or around March 2020, where he met with investors

6

and potential investors at a victim-investor's home. During that meeting Royer solicited investment in his forex account.

18.    Approximately a year later, in or around April 2021, Royer held an in-person meeting with investors and potential investors at a union hall in Livonia, Michigan. During that meeting, Royer solicited investment funds for his forex account and encouraged those present to tell others about investing with him.

19.    About another year later, Royer returned to the Eastern District of Michigan and held another in-person investment meeting at a cabin in Clarkston, Michigan, in or around May 2022, where he again solicited investment funds for his forex account and encouraged those present to tell others about investing with him.

20.    I have seen video recordings of some of these investor meetings. During meetings, Royer led investors to believe he was an experienced forex trader who was trading forex successfully in the forex account on behalf of himself and other investors. For instance, during the April 2021 meeting, in promoting his forex account as an investment opportunity, Royer told those present that his "business for the last three years" had been trading "regular currency," on behalf of himself and other individuals. Moments later, he asked a member of the audience, "Is it working?" which was met by a positive response.

21.     Royer's statement that his business for the last three years had been trading currency is notable because in or around August 2020, Royer obtained a Covid-19 pandemic-related Small Business Administration Economic Injury Disaster Loan ("EIDL"). According to details of the EIDL loan application, Royer sought the loan as an independent contractor, and his 2018 tax information with that loan application listed his occupation as "handyman." Absent in the loan details is any information that he was earning income from trading or employed as a trader. Thus, if his EDIL loan application was accurate and not materially false in any respect, Royer's business was in construction, not trading currency.

22.     During the May 2022 meeting, Royer promoted investing in his forex account as a way for those on Social Security and retirement plans to "augment" their monthly "cash flow." In truth, however, Royer's trading in the forex account was generally not successful, that is, he generally lost money. In fact, his trading results were negative each year from 2020 through 2022, that is, he lost money overall each year from 2020 through 2022. But Royer did not disclose his monthly or annual trading losses.

<u>Royer's received investors' funds using his personal bank accounts</u>

23.     It was part of the scheme that Royer made misrepresentations and material omissions about how investors' money would be held and invested.

8

24.    In soliciting investor funds, Royer told investors that he would pool investor funds with his own money in the forex account and use the funds for forex trading to generate investment returns. As noted above, Royer told investors that his goal was to generate investment returns of ten percent per month for investors, and he would keep only returns above ten percent for himself—that was his sole compensation. However, contrary to his representations, Royer did not put all the investor funds in the forex account, and in addition, often instead of transferring the full amount of investor funds into his forex account upon his receipt, Royer would use investor funds to cover some of his personal expenses.

25.    Royer's forex account was a personal trading account at FOREX.com. Generally, FOREX.com's policies only allow the account holder to deposit funds into a personal trading account. Consequently, investors could not transfer funds directly into the forex account. Rather than set up a separate bank account to receive investor funds and transfer funds into the forex account (and vice versa to fulfill investor withdrawal requests), Royer directed investors to send their investment funds to his personal bank and financial accounts.

26.    Royer used several personal bank and financial accounts to receive and hold investors funds. Royer received investor funds using his personal accounts at JPMorgan Chase, Wells Fargo, Bellco Credit Union, and First Bank. Royer also used electronic payment applications such as PayPal to receive investor

funds. In doing so, Royer comingled investor funds with his personal funds in those bank and financial accounts.

27.     For example, Heather Swantek, a victim investor from the Eastern District of Michigan, sent investment funds to Royer's personal bank account at JPMorgan Chase in or around March 11, 2020, after receiving transfer instructions from Royer by email. She was not the only victim investor who sent investment funds to Royer's personal bank account. Sandra Holden, a victim investor, wired money to Royer's personal bank account at Wells Fargo in November 2021 and in January 2022. Similarly, Mark Haeg wired money to Royer's bank account at Wells Fargo. Erik Hicks sent investment funds via PayPal to Royer's PayPal account, which Royer transferred into his personal bank accounts at JPMorgan Chase and Wells Fargo.

28.     At all relevant times during the scheme, Royer lived in Colorado. Over the course of the scheme, in or around May 2021, Royer moved to the Target Premises from another address in Colorado. Following the move, the Target Premises began appearing on various account records as the accountholder's address, including for Royer's accounts at the above-referenced financial institutions. The Target Premises also began appearing as the accountholder's address on the monthly forex account statements too.

29.     I know from training and experience that banks and credit unions generate monthly account statements and that accountholders will often keep account statements, account opening papers, and/or account-related correspondence and records at their home for safekeeping. In this case, these bank and financial account materials are evidence that confirm Royer's control of relevant accounts. The forex account records are also evidence in this case. Like bank records, I know from training and experience that individuals often keep investment account records and statement at their home for safekeeping. In general, I know from training and experience that people often keep these types of financial records and information in their homes for safe keeping because they are confidential information.

<u>Royer's use of investor funds to cover personal expenses</u>

30.     After accepting investor money using his personal bank or financial accounts, Royer often did not transfer the investment funds immediately into the forex account. The funds would stay in his personal accounts for some time. In addition, to the extent he did transfer investor funds into the forex account, the amount he transferred was often less than the full amount he had received from the investor.

31.     Take for instance Swantek's March 2020 investment. She sent her investment of $5,000 to Royer's JPMorgan Chase bank account in or around

March 11, 2020. In that account, Swantek's investment funds were comingled with Royer's personal funds – there was approximately $621.66 in Royer's JPMorgan Chase account at that time. Approximately two days after receiving Swantek's investment funds, on or about March 13, 2020, Royer transferred approximately $3,000 into the forex account from his JPMorgan Chase account, thus leaving approximately $2,000 of Swantek's investment funds in Royer's JPMorgan Chase account. Between approximately March 13, 2020, and March 17, 2020, Royer spent over $2,000 on various personal expenses, including at a car wash, food/beverage, and travel, without any additional income seeming to come into his JPMorgan Chase account during that same period. Thus, it appears Royer used investor funds – in this example, some of Swantek's investment funds – to make personal purchases and not for forex trading to generate investment returns.

32.    On or about June 4, 2021, Cynthia Argue transferred $10,000 to Royer's JPMorgan Chase account to be invested in the forex account. Prior to receiving Argue's investment funds, the balance in Royer's JPMorgan Chase account on June 3, 2021, was approximately $43.73. Approximately four days after receiving Argue's investment funds, Royer transferred only approximately $5,900 of those funds to the forex account on June 7, 2021, leaving approximately $3,100 of Argue's investment funds in his JPMorgan Chase account. On or about that same day, June 7, 2021, Royer transferred approximately $1,500 to Simply Dena,

which is believed to be an account belonging to Royer's wife whose first name is Dena. Royer also made other personal expenditures on or about June 7, 2021, including suspected credit card payments, a purchase at a distillery, and a transaction at a suspected restaurant. Prior to receiving Argue's funds, Royer did not appear to have funds in his JPMorgan Chase account to cover these personal expenses, and thus appears to have used Argue's funds to complete these non-forex transactions.

33.     On or about November 26, 2021, Sandra Holden transferred $40,000 to Royer's personal bank account at Wells Fargo to be invested in the forex account for forex trading. Prior to receiving Holden's investment funds, the balance in Royer's Wells Fargo account was approximately $2,019.95. After receiving Holden's investment funds on November 26, 2021, Royer did not transfer funds from his Wells Fargo account to the forex account until on or about November 30, 2021. The amount he transferred into the forex account on or about November 30, 2021, was approximately $15,000. Prior to that transfer, Royer made approximately $2,500 in suspected credit card payments to Capital One and Discover Card and transferred approximately $10,000 to his personal Coinbase account on November 29, 2021. It therefore appears that Royer used Holden's investment funds to complete these transactions as Royer did not appear to have sufficient funds in his account to make them otherwise.

34.    The above are examples and are not the only instances of Royer appearing to use investor funds for personal use and not transferring the full amount of investor funds into the forex account upon receipt. The above examples show there is probable cause to believe Royer misappropriated investor funds for his personal use.

35.    Moreover, while Royer may have told investors that investment funds in his forex account would be comingled with his investment funds, I have not seen any evidence to date that Royer told investors he would comingle their investment funds with his personal funds in his personal bank accounts. I have also not seen any evidence to date that Royer disclosed to investors that he would hold investor funds in his personal bank accounts instead of the forex account and use investor funds to cover his personal expenses.

36.    I know from training and experience and conversations with other experienced agents, that people often will keep receipts of transactions and will keep those receipts in their home, including, but not limited to, travel receipts, restaurant receipts, and ATM receipts. I am also aware that credit card companies often send month statements to cardholders. Such receipts and statements are potential evidence in this case about Royer's misuse of investor funds. I also know from training and experience and conversations with other agents that Coinbase users sometimes keep Coinbase account statements and account documentation in

their home. Coinbase is an online platform for buying, selling, transferring, and storing cryptocurrency. Based on records I have reviewed, Royer appears to have transferred investor funds to his personal Coinbase account. So Coinbase records at the Target Premises are potential evidence of Royer's control of the Coinbase account and potential evidence of his misappropriation of investor funds.

#### Royer falsely reported investor account balances in the scheme

37.     Royer generated end-of-month monthly account balance statements for his investors, purportedly showing the value of the investor's account at the end of the month, the opening value of the account for the next month, and sometimes the rate of return for the month that just ended. Little, if any, of the account balance information was true.

38.     Royer falsely reported gains in investor account balances in months where he lost money trading in the account. In October 2020, Erik Hicks sent an initial investment of $5,000 to Royer to be invested in the forex account. At the end of October 2020, Royer reported to Hicks that he (Royer) had earned ten percent profits during October 2020 and so there was a gain in Hicks' investment account balance at the end of October 2020. In truth however, Royer had lost almost $30,000 in the forex account through trading in October 2020. In early November 2020, Hicks transferred additional investment funds to Royer to be invested in the forex account. At the end of November 2020, Royer again reported

a gain of approximately ten percent on Hicks' investment account balance. But in truth, Royer had lost almost $45,000 in the forex account through trading in November 2020.

39.     Just before Christmas in December 2020, Royer told Hicks that he would be taking time off for the holidays and that as a result the investment return for December 2020 was 7.5 percent. In reality, Royer did not earn any profits through trading in December 2020; in fact, he lost money trading in December 2020. By falsely reporting 7.5 percent gains, Royer concealed his trading losses and lulled Hicks into believing that his investment was profitable when it was not. In that same email in which Royer falsely reported 7.5 percent gains for December 2020, Royer told Hicks, "2021 is going to be an interesting year and I am looking forward to breaking new plateaus and move this investment to new powerful levels."

40.     Royer's trading loses continued. In January 2021, Royer falsely reported positive investment returns to Hicks when in fact Royer lost money trading in January 2021. Royer's losses continued in February 2021. Yet, Royer falsely told Hicks that they were "[o]ff to a good start for the year," in an email on or about February 28, 2021.

41.     On the basis of the supposed positive returns in the monthly statements, some investors made additional investments with Royer. For example,

Hicks, believing his investment was growing in value, invested more funds with Royer in early March 2021. Heather Swantak made additional investments with Royer as well. Cindy Argue and Brenda Moss did too. So did other investors.

42.    The investor account balances Royer sent to investors in 2020 did not accurately reflect the state of the investors' accounts. In truth, Royer's trading results with funds in the forex account were negative in 2020, that is, he lost money in 2020. In fact, he lost money in a majority of the months in 2020.

43.    Likewise, the investor account balances Royer sent to investors in 2021 and 2022 did not accurately reflect the state of the investors' accounts. Royer lost money in a majority of months in 2021 and in the majority of the months in 2022.

44.    Royer not only failed to disclose the extent of his trading losses, but he concealed his losses from investors. Royer reported a ten percent return to Cynthia Argue on her investment account in June 2021, when in fact Royer lost almost $38,000 trading in the forex account in June 2021. Royer reported a 7.5 percent return on Brenda Moss's investment account balance for the month of December 2021, when in fact Royer lost nearly $25,000 trading that month. In May 2022, Royer lost almost $39,000 trading with funds in the forex account, but he reported a seven percent return to Brenda Moss on her investment account balance that month.

17

Royer mislead investors about the status of their investment funds

45.    It was part of the scheme that Royer concealed the truth to encourage additional investment and lull investors into maintaining their investments.

46.    Royer told investors and potential investors that he would pay the taxes related to the forex account. By telling investors that he would take care of taxes, Royer concealed the profitability (or lack thereof) from investors.

47.    Further, Royer described the investment arrangement as informal which he used to justify limiting the information he shared with investors, which in turn made it more difficult for investors to request, receive, or review an accounting of the trades made with their money or evaluate his actual trading performance.

48.    During the April 2021 and May 2022 in-person meetings and elsewhere, Royer told investors that they would be able to make withdrawals from their account as needed. And Royer caused some transfers to be made to investors who wished to withdraw some funds from their account. Royer touted the withdrawals during some of the in-person investor meetings. In making withdrawal payments and touting the ability of investors to withdraw funds as needed, Royer caused investors to believe their investment funds were secure and accessible, when in fact investor funds were being depleted.

18

49.    In or around August 2022, Royer told investors that they would need to adjust their withdrawal amounts. But Royer made no mention of trading losses. In October 2022, Royer claimed that his trading platform was to blame for further restricting his ability to fulfill investor withdrawal requests. He told investors he could still trade in the account but that he could not access the money to be able to make withdrawal payments. As the months continued, Royer continued to blame his trading platform for the supposed hold on withdrawals, while leading investors to believe that their money was still secure in the forex account.

50.    By the end of December 2022, Royer had depleted virtually all the funds in the forex account, down to approximately five dollars, and stopped trading in the account going forward. Royer, however, did not disclose that to investors.

51.    In January 2023 through at least March 2023, Royer continued to report that the status was unchanged even though in truth Royer had stopped all trading in the account and the funds in the account had been depleted down to approximately five dollars.

52.    Furthermore, in early 2023, Royer was working as a handyman/ independent contractor based on invoices from March 20, 2023, April 15, 2023, May 3, 2023, and May 19, 2023. (The invoices listed the Target Premises consistent with the Target Premises being Royer's business address.) I have not seen any evidence to date that Royer informed investors that he had stopped

19

trading in the account, that he had shifted his business priorities and was spending his time on other business pursuits. These construction invoices are therefore evidence of material omissions.

53.     I know from training and experience and conversations with other experienced agents that business owners often keep copies of work invoices in a secure location such as at their business address. Here, for Royer, that business address is the Target Premises based on the invoices I have seen.

54.     I am also aware that Royer started a non-profit company using the Target Premises as the company's address and opened a bank account using the Target Premise as the account address in on or about June 2022. This is another instance where Royer may have materially omitted telling investors that he had decided to shift his priorities and was spending his time on other pursuits and not working full time as trader.

55.     As noted above, I know from training and experience and conversations with other experienced agents that business owners will often keep business records in a secure location such as at their business. Here, for this non-profit company, that business address is the Target Premises.

56.     Ultimately, on or about June 7, 2023, Royer emailed investors telling them that "[t]he money in our account is gone." Royer claimed he lost it in forex trading. Royer did not tell investors that he had not transferred all investor funds

into the forex account, that he had not invested all investor funds as he had told investors he would, that is, in forex trading, and that he used investor funds to cover personal expenses.

57.    In addition, in the months that followed, Royer told investors that he planned to make investors whole, but he never did. For example, in July 2023, Royer, via cellphone text message, told victim-investor Cindy Argue that "the only plan [he] would ever have going forward, would include some sort of larger amount of money coming in … so I could start returning some but that hasn't happened yet." Royer told an investigator from the State of Michigan Department of Licensing and Regulatory Affairs via email in July 2023 that he (Royer) had "completely lost [his] mojo after trading for a few years," and that he was "continu[ing] to try and find some solution to begin paying [investors] back." In September 2023, Royer sent an email to investors claiming that he had "looked into loans and such but that is a dead end." Among the evidence investigators seek and may find at the Target Premises (including on Target Devices), is whether Royer has in fact taken any steps to try to repay investors or whether his statements about trying to repay investors are further instances of deceit.

<u>Documents used in furtherance of the scheme</u>

58.    Evidence of Royer's trading activity is likely stored on the Target Devices. His trading activity is relevant because Royer made claims about his

trading activity to investors. For example, in his February 2020 email soliciting interest in investing in his forex account, Royer claimed to trade his account every day. He also told investors and potential investors during one of the in-person investor meetings that he purportedly kept odd hours to be able to trade on various foreign markets. These representations were part of Royer's efforts to induce investors and potential investors to trust him with their investment funds by leading them to believe he was a capable, experienced, and accomplished forex trader. His trading activity and trading records, or lack of trading activity and records, are evidence of whether his representations were materially false and misleading.

59.     As part of the scheme, Royer mispresented that investors' money would be held in his forex account, when in fact some investors' money was not transferred to his forex account from his personal bank or financial accounts. Evidence related to Royer's receipt of investor funds and transfers of investor funds is likely stored on the Target Devices.

60.     In addition, as discussed above, Royer falsely reported investor account balances that did not actually reflect his trading activity and status of investors' funds in the forex account. Because these were electronic documents, there is reason to believe these documents are likely stored on the Target Devices.

61.     Further, Royer needed a way to keep track of what he was reporting to investors in terms of their account balances so he could continue to send them account balance updates. Based on emails I have reviewed from Royer to investors, Royer used a spreadsheet to keep track of the various incoming funds from investors and the growth of those funds for each investor. On occasion, investors would contact Royer if they thought there was a mistake in their account balance.

62.     Victim investor Cynthia Argue contacted Royer around July 2021 about her balance being off. Royer responded "My sincere apologies and thank you for the heads up. I knew that didn't sound right. My spreadsheet didn't update the information."

63.     Around December 2021, Royer sent an email to Tomasko in which Royer wrote: "PS…if for any reason the monthly numbers don't seem to add up for what you thought they should be or how you have figured, please let me know. It has happened a couple of times with people so far and I am so glad they let me know. My spreadsheet is full and I miscalculate at times with a wrong line item." Royer sent a similar email to Hicks in December 2021.

64.     Around January 2022, Royer sent another email to Tomasko, stating "Sorry, my spreadsheet calculated 10% for December and I didn't adjust it for the actual 7.5%." Royer also wrote that in an email to Hicks in January 2022 as well.

65.     The above emails provide reason to believe that Royer was using a spreadsheet to keep track of false investor account balances. This spreadsheet is evidence. It was likely created using a computer. In fact, Royer presented information to investors at the in-person April 2021 meeting in which he accessed a Google Drive account via a laptop computer to show his new business. Prior to pulling up the file for his new business, the main screen of the Google Drive account showed eight files. The first of those eight files listed was named Trading Tracking.

66.     I reviewed IP address information provided by Google related to the Google Drive account. Based on open-source internet IP address lookup information, IP address information provided by Google reflects that Royer appears to have accessed the Google Drive account in Montrose, Colorado, which is consistent with him accessing the account from the Target Premises and using electronic devices, *i.e.*, the Target Devices, at the Target Premises in furtherance of the scheme.

### Royer's ties to the Target Premises

67.     According to a receipt from Elevate Fiber, a home internet service provider in Colorado, home internet service was set up at the Target Premises on or around April 16, 2021. Royer's wife placed an order on May 12, 2021 at the Home Depot for delivery of items to the Target Premises. And Royer's driver license lists

the Target Premises as his address. Accordingly, the Target Premises is believed to be Royer's primary residence and Royer is believed to have resided at the Target Premises since in or around May 2021.

68.    In addition, Royer has listed the Target Premises as the accountholder's address on accounts relevant to the scheme in this case. Royer's name and the Target Premises were listed on the forex trading account statements starting from the end of August 2021/beginning of September 2021. The Target Premises was listed as the accountholder address on Royer's financial accounts at JPMorgan, Wells Fargo, and Bello Credit Union.

69.    To the extent Royer engaged in forex trading in the forex account, there is reason to believe he did so at Target Premises. Starting in or around September 2021, the monthly forex account statements listed the Target Premises as the accountholder's address and Royer used the Target Premises as his business address on invoices that he sent customers related to his construction work. Thus, there is reason to believe Royer uses the Target Premises as both his residence and for business. In addition, the forex account in this scheme was a FOREX.com personal account. I know from conversations with other experienced agents, that it is common for those who have personal trading accounts, like the account in this scheme, to engage in trading at their home using a home computer, laptop, or perhaps a smartphone or electronic tablet.

70.    Based on my training and experience, I know that individuals involved in criminal investment fraud schemes often maintain records relating to their criminal activity. These records are often critical to keeping the scheme going. These records are often maintained in various forms ranging from printed business and bank records, to handwritten notations on pieces of paper, to notebooks, to ATM receipts, to computer stored and generated records. Based on my training, experience, and discussions with other law enforcement officers, I know that individuals who engage in fraudulent activities, often maintain historical books, records, receipts, notes, ledgers, and copies of checks or other financial instruments used to facilitate the scheme to defraud. The perpetrators normally keep these records in their residences and/or vehicles where they can readily have access to them. For these reasons, I am requesting permission to search for and seize such items from the locations described in Attachment A.

71.    I also know, based upon my training, knowledge, and experience, that persons engaged in the above activities may have large amounts of U.S. currency, which are the proceeds of the crime, in secure places such as safes, storage units and lock boxes. For this reason, I am requesting that if any safes or other locked containers are found on the premises, locksmiths may be used to open the safe or container either on the premises, or if reasonably necessary, any safe or container may be moved off-premises to be opened.

26

72.    Further, as noted above, Royer was previously convicted of securities fraud among other charges. Based on my training and experience, I know that those engaged in fraud who have been previously convicted of a fraud-related crime, will often keep important records related to their criminal activities at their residence for safekeeping, but may take extra steps to try to hide or conceal the evidence, especially from plain view, to try to avoid being caught. For instance, a criminal may try to hide records in places not easily seen, such as in a garage, or in the trunk of a vehicle that is inside a garage or shed. Accordingly, as noted above, I am requesting that the search warrant authorize a search of the entire premises (including any sheds or garages, and any safes or locked storage containers) and any vehicles on the premises.

### Use of electronic devices in furtherance of the scheme

73.    To make an investment scheme like this work, it was necessary for Royer to use electronic devices, like computers, phones, and tablets, not only to communicate with victim investors, but also to transfer funds among accounts and engage in at least some, albeit largely unsuccessful, forex trading. In addition, as described above, Royer used investor funds to cover personal expenses, some of which, such as PayPal transfers and payments for credit cards, appear to be electronic payments that would have been initiated using electronic devices like a computer, phone, or tablet.

27

74.    I know from prior investigations, my training, and from conversations with other experienced investigators that significant evidence of fraud schemes has been found on electronic devices like computers, cellphones, and tablets. In this case, there is ample evidence that electronic devices were used in furtherance of the scheme. As noted above, some of the activities, such as trading in the forex account, require the use of electronic devices. In addition, I know from investors that Royer communicated with some victim investors via cellphone text messages. I also know that investors sent investment funds to Royer using electronic transfer applications such as PayPal, which require the use of an electronic device. In addition, Royer communicated with investors by email, including to send fraudulent investor account balance statements. Further, as noted above, Royer used a laptop during the April 2021 in-person meeting to present information to investors and potential investors, and as noted above, he discussed using a spreadsheet to keep track of investor account balances in emails to investors. Thus, there is reason to believe that Royer relied on computers and mobile electronic technology to commit the offenses in the indictment and that evidence of the offenses is stored on his computers, tablets, cell phone(s) and portable electronic media, such as portable thumb drives and external hard drives. Such evidence includes correspondence, receipts, bank account information, credit/debit card

account information, credit union account information, trading account information, trading records, investor contact information, and tax information.

75.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and

29

the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

30

76.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

77.     Based on my training and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when files have been deleted, they can be recovered months or years later using readily available forensics tools. When a person "deletes" files on a computer, the data contained in the file does not actually disappear; rather the data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space; that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. Due to the size of storage systems on modern computers—often 500 gigabytes or greater—deleted files are rarely overwritten by new data.

78.     In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory

or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

79.    Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.

80.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

81.     I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.      Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

b.      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis

33

of the equipment and storage devices from which the data will be extracted.

c.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in laptop computers. Consequently, each computer found during a search can easily contain the equivalent of 80 million pages of data.

d.     Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or

34

"keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

82.    Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

83.    As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has

been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

84.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

85.    Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

86.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

87.     To the extent any other people in addition to Royer share the Target Premises as a residence, it is possible that the Target Premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is reasonably likely that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

<u>Use of Biometric Features to Unlock Electronic Devices</u>

88.     The warrant I am applying for would permit law enforcement to compel Royer to unlock a device subject to seizure pursuant to this warrant that is in his possession or for which law enforcement otherwise has a reasonable basis to

believe is used by him using the device's biometric features. I seek this authority based on the following:

    a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

    b.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found

38

on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.      If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on

patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.    As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric

features necessary to the execution of the search authorized by this warrant.

g.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

89.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to seizure pursuant to this warrant and may be unlocked using one of

the aforementioned biometric features, and the device is in Royer's possession or law enforcement otherwise has a reasonable basis to believe is used by Royer, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of Royer to the fingerprint scanner of the device(s) found at the premises; (2) hold the device(s) found at the premises in front of the face of Royer and activate the facial recognition feature; and/or (3) hold the device(s) found at the premises in front of the face of Royer and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

## CONCLUSION

90.    I submit that this affidavit supports probable cause for a warrant to search the Target Location described in Attachment A and seize the items described in Attachment B.

## Attorney-Client Privileged Materials

91.    If the government becomes aware of a reasonable possibility that seized materials may include attorney-client privileged information, the government will implement filter protocols to safeguard attorney-client privileged

materials and segregate those materials from review by any member of the

investigative team.

Respectfully submitted,

*s/ Kimberly Coombs*
Kimberly Coombs, Special Agent
Federal Bureau of Investigation

Submitted, attested to, and acknowledged before me by reliable electronic means on October ‾15‾, 2024, Grand Junction, Colorado.

*Richard T. Gurley*
Richard T. Gurley
United States Magistrate Judge

This application and affidavit were reviewed and submitted by Assistant United States Attorney Jennifer Springer.

43